IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHRISTOPHER MORA,

    Petitioner,

v.                            Civ. No. 01-748 JP/RLP

JOE WILLIAMS, Warden,

    Respondent.

## MAGISTRATE JUDGE'S PROPOSED
## FINDINGS AND RECOMMENDED DISPOSITION[1]

1.    This is a proceeding for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. Mr. Mora is currently serving a life sentence, a jury having found him guilty of First Degree Murder (Felony Murder), with the underlying offense being Criminal Sexual Contact, and of Criminal Sexual Contact in the Third Degree (Child Under 13). See Answer, Exhibit I thereto (Amended Judgment, Sentence and Commitment).

2.    Mr. Mora filed a direct appeal of his conviction, which resulted in the New Mexico Supreme Court (NMSC) opinion in State v. Mora, 950 P.2d 789 (N.M. 1997).[2] The verdict on the above two charges was affirmed. Mr. Mora filed a petition for writ of habeas corpus in state court on January 27, 1999. Exhibit J to Answer. After a full evidentiary

---

[1] Within ten (10) days after a party is served with a copy of the Magistrate Judge's Proposed Findings and Recommended Disposition (the "Proposed Findings") that party may, pursuant to 28 U.S.C. § 636(b)(1), file in the United States District Court written objections to the Proposed Findings. A party must file any objections within the ten-day period allowed if that party wants to have appellate review of the Proposed Findings. If no objections are filed, no appellate review will be allowed.

[2] That opinion vacated his conviction for intentional child abuse resulting in death on the ground of double jeopardy.



hearing on the merits, the state court entered its Findings of Fact and Conclusions of Law on April 28, 2000. Exhibit P. Relief was denied. The state court issued its Order denying the writ on May 12, 2000. Exhibit Q. Mr. Mora filed a petition for writ of certiorari on June 12, 2000, which was granted on August 8, 2000. Exhibits R & U. After briefing and oral arguments, the NMSC quashed the grant of certiorari on May 7, 2001. Exhibits FF & GG. The petition in this case was timely filed on June 28, 2001. The state concedes exhaustion. Answer, ¶ 3.

3. Mr. Mora's petition in this court was filed by retained counsel, who also filed a Memorandum Brief in Support of the petition [Doc. 2]. Respondent, having been granted an extension of time to file its Answer, also filed a Motion to Dismiss on August 29, 2001 [Doc. 11]. That Motion was devoid of grounds for relief and Mr. Mora's request to expand the record was granted and ruling on that motion was deferred until the case had been fully briefed. [Doc. 14]. Briefing was completed on December 3, 2001.

4. Christopher Mora lived with his girlfriend, Andrea Garcia, and her 23-month-old daughter, Christina Sierra. Mr. Mora and Ms. Garcia had been dating since 1993 and moved in together in September, 1994. Ms. Garcia's mother, Virginia Saavedra, lived with them until the end of October, 1994. The events giving rise to Mr. Mora's arrest occurred on Thanksgiving day, November 24, 1994. *Mora*, 950 P.2d at 793.

5. According to Ms. Garcia, she and Mr. Mora arose in the morning and she went to Christina. The three of them then watched the Macy's Thanksgiving Day Parade on television until Ms. Garcia decided to take a shower, leaving Mr. Mora in charge of Christina. She testified she took a lengthy, 25 to 35-minute shower and when she

emerged from the bathroom saw Mr. Mora carrying Christina back to bed. He told her that Christina had fallen asleep. *Id.*

6. According to Mr. Mora's trial testimony, he and Ms. Garcia were having sex when Christina began crying from her bedroom. Mr. Mora said he insisted that Ms. Garcia tend to Christina and she slammed the bedroom door as she went to Christina. Mr. Mora said that Ms. Garcia took Christina into the living room and that Christina was crying or screaming and then she suddenly stopped. When he came into the living room about 20 minutes later, Christina appeared to be asleep and it was at this point that Ms. Garcia went to take a shower. Mr. Mora testified that he put Christina to bed and then went into another room to take a phone call from his friend, Joseph Sena. *Id.*

7. Once Ms. Garcia and Mr. Mora realized that Christina was unconscious and not breathing, they called 911 and paramedics took her to the hospital, where she was treated by several medical personnel. The trial testimony differed as to cause and date of occurrence, but it is undisputed that Christina had a one inch tear near her anus, the perineum. One physician testified that in her opinion, Christina had been anally raped within 24 hours of the physician's examination. The defense expert testified that the tear was approximately one week old and that the autopsy contained no evidence of any vaginal bleeding and bruising and there was no evidence of sexual abuse. *Id.* at 794. Christina died the day after Thanksgiving. The cause of death was blunt trauma to the head. *Id.*

8. Mr. Mora asserts the following grounds for relief: (i) insufficiency of the evidence for both the felony murder and the criminal sexual contact convictions; and (ii)

3

ineffective assistance of counsel based on (a) conflict of interest; (b) failure to recall a witness; and (c) failure to make pertinent objections at trial.

9.  Mr. Mora filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and his case is therefore governed by its provisions. Because Mr. Mora's claims have all been adjudicated on their merits by the state court, he is entitled to relief only if he can establish that

> the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law; decided the case differently than the Supreme Court has on a set of materially indistinguishable facts; or unreasonably applied the governing legal principle to the facts of the prisoner's case.

*McCracken v. Gibson*, 268 F.3d 970, 975 (10th Cir. 2001) (citing *Williams v. Taylor*, 529 U.S. 362, 412-413 (2002)).

"The reasonableness of the state court's application of federal law is to be evaluated by an objective standard." *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (2001) (citing *Williams*, 529 U.S. at 413). "Unreasonable," as defined by the Court, is different from an incorrect or erroneous application. *Id.* (citing *id.* at 412). Factual findings are presumed correct unless rebutted by clear and convincing evidence. § 2254(e)(1).

10.  <u>Insufficiency of the evidence</u>. Mr. Mora argues that the NMSC unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979) to the facts of his case when the state court found that the prosecution had proved all of the essential elements of felony murder. The *Jackson* inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Id.* at 319 (emphasis in the original). This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.

11. In New Mexico, felony murder is defined as:

> Murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused:
>
> . . .
>
> in the commission of or attempt to commit any felony . . .

NMSA (1978) § 30-2-1(A)(2).

12. The crime of criminal sexual contact of a minor is a third-degree felony. *See* NMSA (1978) § 30-9-13. That crime is defined as "the unlawful and intentional touching or applying force to the intimate parts of a minor." *Id.* "Intimate parts" includes the genital area and the anus. *Id.*

13. The NMSC has imposed a *mens rea* requirement for felony murder.

> "Under the [felony murder statute], proof that a killing occurred during the commission or attempted commission of a felony will no longer suffice to establish murder in the first degree. In addition to proof that the defendant *caused* . . . the killing, there must be proof that the defendant *intended* to kill (or was knowingly heedless that death might result from his conduct). An unintentional or accidental killing will not suffice. . . . " We reaffirmed this holding in *State v. Griffin*, 866 P.2d 1156, 1162 (1993), in which we held, "The felony murder [mens rea] requirement is satisfied if there is proof that the defendant intended to kill, knew that his actions created a strong probability of death or great bodily harm . . ., or acted in a manner greatly dangerous to the lives of others."

*State v. Lopez*, 920 P.2d 1017, 1019 (N.M. 1996) (quoting *State v. Ortega*, 817 P.2d 1196, 1205 (1991) and *State v. Griffin*) (parallel citations omitted, emphasis by the court).

5

14. "[T]he purpose of the felony-murder rule in New Mexico is to elevate second-degree murder to first-degree murder 'when it occurs in circumstances that the legislature has determined are so serious as to merit increased punishment.' . . . [T]hese serious circumstances include the commission of a first-degree felony or a lesser-degree felony that is itself inherently dangerous or is committed under circumstances that are inherently dangerous." *State v. Campos*, 921 P.2d 1266, 1272 (N.M. 1996) (citations omitted).

15. Mr. Mora contends that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he intended to kill Christina. He argues that the evidence about Christina's injuries was conflicting and there was no direct testimony as what caused Christina's head injury: "The facts established only that Mora was alone with Christina during part of the time when the injury leading to her death could have occurred, Garcia was alone with Christina during part of that time, and the injury was extensive." Memorandum in Support of Christopher Mora's Petition for Writ of Habeas Corpus ("Memorandum") [Doc. 2] at 17. Mr. Mora states that with no evidence of how Christina was killed or who committed the act, the jury was left to speculate as to the perpetrator, the cause of the injury, and the state of mind required for a conviction. *Id.* Thus, he concludes, the NMSC's opinion that the extent of Christina's injuries alone established the necessary *mens rea* was an unreasonable application of *Jackson v. Virginia*. *Id.*

16. The undisputed facts show that both Mr. Mora and Ms. Garcia were alone with Christina on Thanksgiving morning and that her head injuries were severe. The adults gave conflicting versions of the events of the morning leading to the 911 call, and each one's testimony tended to implicate the other. An X-ray of Christina's head taken on

November 14, 1994 showed no skull fractures. A CAT scan, her surgery, and the autopsy showed severe soft-tissue injuries, a skull fracture, and "blood clots consistent with previous episodes of trauma." *Mora*, 950 P.2d at 794. One physician testified that the injuries occurred within 24 hours of the November 24th X-ray and another physician estimated the injuries occurred within two hours of her Thanksgiving morning surgery.

17. Similarly, there was conflicting testimony about the timing of the tear above Christina's perineum. One physician testified Christina had been anally raped within 24 hours of her examination; Mr. Mora's expert testified the tear was a week old and there was no evidence of sexual abuse.

18. Mr. Mora gave conflicting accounts of the events of Thanksgiving morning, accounts that differed from his trial testimony summarized at ¶ 6, *supra*. He had told police investigators that when he awoke Thanksgiving morning he made Christina's cereal, which she had eaten. He had told Randy Chavez, Ms. Garcia's cousin, that Christina had fallen asleep on the couch while Ms. Garcia was taking a shower and that he had picked her up and when Ms. Garcia had finished her shower, the two of them put Christina to bed. Mr. Mora also claimed that while Ms. Garcia was in the shower, he was talking on the telephone to his friend, Joseph Sena; Mr. Sena denied having spoken with Mr. Mora on Thanksgiving morning.

19. All of the foregoing factual disputes were resolved by the jury against Mr. Mora. Either Mr. Mora or Andrea Garcia killed Christina on Thanksgiving morning, given the severity of her head injury and the undisputed medical testimony that she would have been unconscious or extremely lethargic shortly thereafter. In such close circumstances,

7

the changes in Mr. Mora's accounts of the morning and his rebutted claim that he spoke to a friend that day would lead most jurors to weigh the facts against him. With regard to the sexual contact, the testimony was conflicting and the jury also resolved that issue against Mr. Mora.

20. Based on the autopsy photo, admitted into evidence, there is a substantial wound above Christina's anus. Whether that injury occurred as a result of anal rape or by prodding with a hard object, either action constitutes criminal sexual contact of a minor. Felony murder requires an intent to kill; knowledge that death or great bodily harm is probable; or conduct greatly dangerous to the lives of others. The medical testimony indicated Christina's head was slammed against a hard object, most likely the floor. Any of the foregoing criteria are met with that conduct. Having read the entire trial transcript, the court finds that the NMSC did not unreasonably apply *Jackson v. Virginia* to the facts of this case. Mr. Mora's arguments in reality do not test the sufficiency of the evidence; instead, he is asking this court to find his version of events more credible than Andrea's. This the court cannot do. *Jackson*, 443 U.S. at 318-19.

21. <u>Ineffective assistance of counsel</u>. Mr. Mora's first claim of ineffective assistance of counsel is counsel's failure to advise his client of a conflict of interest. When Mr. Mora's counsel indicated that the defendant would take the stand to testify, the prosecution advised the court (in a conference in chambers) that a police officer had overheard counsel telling his client that he'd have to take the stand and lie. The prosecutor said that if Mr. Mora testified, the officer might testify in rebuttal. Counsel denied the charges and asked Mr. Mora, "Did I ever ask you to lie?" Mr. Mora said no. When Mr.

Mora took the stand, counsel asked him if anyone asked him to lie. Mr. Mora said no. *See* Trial Transcript Volume dated January 30, 1996, at 30 *et seq*. When Mr. Mora took the stand the prosecutor did not allude to the incident in chambers nor did he call the police officer as a rebuttal witness.

22. Mr. Mora contends that he and his counsel had a conflict of interest because counsel was trying to protect himself from criminal prosecution for suborning perjury and at a minimum should have advised his client to retain counsel until the matter was resolved.

23. When a conflict of interest is claimed, the defendant must demonstrate an actual conflict which adversely affected his lawyer's performance. *United States v. Alvarez*, 137 F.3d 1249, 1251 (10th Cir. 1998). If such a showing is made, prejudice is presumed. *Id*. In the trial court's Findings of Fact and Conclusions of Law, entered after the habeas hearing. Record Proper, Vol. 2 of 2, RP0433 ("Findings & Conclusions"), the court found: "No actual conflict of interest existed between trial counsel and Mora. It was in the interest of both [counsel] and Mora to show that both were honest." *Id*. at ¶ 58.

24. I agree with the trial court that there was no conflict of interest that adversely affected counsel's representation. "An actual conflict of interest results if counsel was forced to make choices advancing other interests to the detriment of his client." *Alvarez*, 137 F.3d at 1252. Thus, the defendant "must be able to point to specific instances in the record which suggest an impairment or compromise of his interests . . . ." *Id*. The record is devoid of such impairment or compromise. *See* Trial Transcript dated January 30, 1996 at 30-37 & 71.

25. Mr. Mora's second ground for ineffective assistance is counsel's failure to recall Virginia Saavedra to the stand. During the trial defense counsel became aware that Henry Campos and Virginia Saavedra, Andrea Garcia's mother and stepfather, had been interviewed more than once and that the prosecution had tapes which had not been turned over to the defense. Ms. Saavedra had already testified and the trial court told counsel they could recall her to the stand. At trial, Ms. Saavedra had testified that Andrea told her that Christina had fallen asleep while Andrea was in the shower. In the statement to police she said that Andrea told her that Christina had fallen asleep before Andrea went into the shower. *See* Interview of Virginia Saavedra dated April 25, 1995 at 38.

26. At the habeas hearing, defense counsel told the court that a tactical decision was made not to recall Ms. Saavedra because counsel believed that if the judge denied the defense motion for a mistrial (which the court did deny), then that failure would be reversible error. *See* Transcript of Proceedings ("Habeas Transcript"), dated October 28, 1999 at 107. Counsel also stated that Ms. Saavedra was a hostile witness and there was some concern that the state could rehabilitate her. *Id.* at 108.

27. In his Findings & Conclusions, the trial judge merely stated that counsel's decision not to recall Ms. Saavedra "was a strategic decision not to cross-examine a hostile witness any further . . . ." *See* Findings & Conclusions, ¶ 61. The court found that because it was a strategic decision, the court would not second-guess counsel's strategy. *Id.*

28. In this federal proceeding, Mr. Mora argues that Ms. Saavedra's statement that Christina fell asleep while watching the parade would support Mr. Mora's version of events and tend to implicate Andrea. This supposition is based on the medical testimony

10

that immediately after Christina's skull was fractured she would have been lethargic or unconscious. Thus, if she fell asleep while watching television, the jury would be able to infer that Andrea had dealt the fatal blow just as Mr. Mora had testified. Because of the importance of this testimony, Mr. Mora argues that counsel was ineffective for failing to recall Virginia Saavedra to the stand to impeach Andrea Garcia's testimony. Unfortunately, Ms. Garcia cannot be impeached by this testimony because it is double hearsay. Ms. Garcia was not a party and what she purportedly told Ms. Saavedra is hearsay and what Ms. Saavedra told the police that Ms. Garcia said to her is also hearsay. See N.M.Evid.R. 11-803. Thus, counsel was not ineffective for not recalling Ms. Saavedra to the stand.[3]

29. Next, Mr. Mora argues that counsel was ineffective for failing to object on Confrontation Clause grounds to the reading of Joseph Sena's statement to the jury. Mr. Mora had told police, and testified at trial, that while Andrea was in the shower he was talking to his friend, Joseph Sena, on the telephone. When the police interviewed Mr. Sena, he acknowledged his long friendship with Mr. Mora but denied having spoken with Mr. Mora until after 5:00 p.m. on Thanksgiving. Mr. Sena died before trial and the transcript of his taped interview was read into the record by Detective Ortiz. See Trial Transcript dated January 26, 1996 at 101. Counsel objected on the ground that the statement was hearsay but failed to raise a constitutional challenge.

30. To prevail on a claim of ineffective assistance of counsel, Mr. Mora must prove both that counsel's performance fell below a reasonable standard of professionalism

---

[3] Even if counsel had somehow been able to get this testimony in, the facts of the case would render it irrelevant as to timing, see ¶ 31, infra.

11

and that but for counsel's errors the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984). Assuming that failing to object to this testimony violates the Confrontation Clause, Mr. Mora cannot show that the result would have been different.

31. In all of Mr. Mora's various versions of what occurred Thanksgiving morning, none indicated that from the time he arose until 911 was called that Christina was unconscious. He told police he had made cereal for Christina, which she had eaten. At trial he testified the three of them watched television together and Christina was fussy and did not want to go into the shower with Andrea. The medical testimony indicated that Christina could not have eaten, talked or walked after suffering the severe fracture to her skull. *See, e.g.*, Trial Transcript dated January 26, 1996 at 28, 94. Thus, the overwhelming inference to be drawn from this testimony, whichever version is believed, is that the injuries suffered by Christina occurred while Andrea was in the shower. Thus, even if the Sena testimony had not been admitted it is more likely than not that Mr. Mora would have been found guilty.

32. Finally, Mr. Mora argues that counsel was ineffective for failing to object to the prosecutor's use of a prior conviction as substantive evidence in the state's closing argument. In *State v. Mora*, 950 P.2d 789 (N.M. 1997), the court determined that the state did not use the conviction as substantive evidence of Mr. Mora's guilt. *Id.* at 804. Instead, the court found that the reference to the stolen gun was mere rebuttal to defense counsel's closing which explained the circumstances surrounding the gun. *Id.*

33. At the state habeas hearing, where this claim was raised as an ineffective assistance of counsel claim, the trial court essentially held the same: because defense counsel opened the door, there were no grounds to object. Habeas Transcript, ¶ 62.

34. In essence, Mr. Mora is arguing that defense counsel was ineffective for commenting on the circumstances of the prior conviction and allowing the "door to be opened." Counsel had objected to the introduction of this evidence at trial and was overruled. Having lost that battle, counsel made a decision to undermine its perceived impact by having Mr. Mora testify to the circumstances of the event. In closing, he argued that the conviction was *de minimus* and that Mr. Mora was a hardworking boy. The prosecutor said that having a gun did not make Mr. Mora as mild-mannered as the defense made him out to be.

35. All of defense counsel's decisions in this regard were strategic decisions and cannot be the ground for an ineffectiveness claim. *Strickland*. The fact that his strategy did not turn out as expected does not make him ineffective.

## RECOMMENDED DISPOSITION

I recommend that Respondents' Motion to Dismiss [Doc. 11] be denied. I recommend that the Petition for Writ of Habeas Corpus be denied and this case dismissed with prejudice.

Richard L. Puglisi
United States Magistrate Judge